UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEW SCHINDEWOLF and
MARY SCHINDEWOLF,                              Case No. 14-12161

             Plaintiffs,                       Honorable Nancy G. Edmunds

v.

CITY OF BRIGHTON, et al,

             Defendants.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [53]**


        This employment dispute comes before the Court on Defendants City of Brighton and

Dana Foster's motion for summary judgment [53].  Plaintiff Matthew Schindewolf's claims

arise from his separation from the City of Brighton on July 23, 2013. (Am. Compl. ¶ 64.)

Plaintiffs bring claims pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. §

12101, *et seq.*, the Family and Medical Leave Act (FMLA) 29 U.S.C. §2601, *et seq.*, the

State of Michigan's Persons With Disabilities Civil Rights Act (PWDCRA), Mich. Comp. L.

§ 37.1101, *et seq.*, and a derivative suit for loss of consortium under Michigan common

law. (Am. Compl. ¶ 4.) For the reasons stated below, Defendants' motion for summary

judgment is granted in part and denied in part.

## I.    Background

Plaintiff Matthew Schindewolf ("Plaintiff" or "Mr. Schindewolf") is a former employee of the Defendant City of Brighton (the "City"), where he began working as the Department of Public Services (DPS) Director in February 2001. (Am. Compl. ¶ 10; Schindewolf Dep. 36, Defs.' Mot. Summ. J. Ex. 1, ECF No. 53.) Mr. Schindewolf worked for the City until July 23, 2013. ( Schindewolf Dep. 107.) Defendant Dana Foster is the City Manager.

Mr. Schindewolf's wife, Plaintiff Mary Schindewolf, has experienced abdominal pain since 2011. (Am. Compl. ¶ 12.) Plaintiffs filed numerous medical records under seal at docket no. 52 to support their own motion for partial summary judgment and they incorporate those documents by reference in this motion. (Pls.' Resp. Br. 4, ECF No. 59.) Without going into the medical details, subject to a stipulated protective order in this matter (ECF No. 50), the record shows that between May 2011 and January 2014, Plaintiff Mary Schindewolf underwent treatment and appointments including surgeries and procedures, in an attempt to pinpoint and treat the cause of her pain. (Am. Compl. ¶ 13; Pls.' Mot. Partial Summ. J. Exs. 1-21, ECF  No. 52.) Between 2011 and 2013, Plaintiff Matthew Schindewolf requested and used intermitted FMLA leave to accompany his wife to medical procedures and appointments. (Am. Compl. ¶ 13(g).) Mr. Schindewolf testified that he applied for FMLA leave in November 2011 for potentially three weeks, for two weeks sometime after that, and again in May 2013. (Schindewolf Dep. 37-39, Ex. 1.) The FMLA forms show leave was requested in March 2012, May 2012 and October 2012 for Mr.

2

Schindewolf to care for his wife.[1] (Pls.' Resp. Ex. 13, filed under seal; *see also* Foster Dep. 60-67.)

Somewhere between April 15 and 17, 2013, Mr. Schindewolf made Jennifer Burke, Human Resources Director for the City, aware that he needed to be out of the office for his wife's upcoming appointments on April 24, May 1 and May 2, 2013. (Pls.' Resp. Ex. 10.) The parties dispute whether this was a request for FMLA leave. On April 17, 2013, Ms. Burke emailed the appointment information to Defendant Foster and included the following question in the same email: "Also, did you want a copy of his employment agreement? I have attached the 'at will employee' policy for your review." (Pls.' Resp. Ex. 10.) Ms. Burke testified that Defendant Foster requested the "at will" policy, yet Defendant Foster does not recall why he asked for the policy that day. (Burke Dep. 34, Foster Dep. 73-74, Pls.' Resp. Exs. 1, 3.) The next day, April 18, 2013, Ms. Burke emailed Denise Meier in payroll to inquire, "Is there any way you can tell me how much time [Mr. Schindewolf] missed during the months of Oct/Nov/Dec of last year?" (Pls.' Resp. Ex. 11.)

Mr. Schindewolf was diagnosed with Major Reactive Depressive Disorder on April 30, 2013. (Am. Compl. ¶ 16.) A few days later, on May 3, 2013, after driving home from a Brighton City Council meeting the prior night, Mr. Schindewolf sent the following text message to Defendant Foster:

---

[1] Mr. Schindewolf testified that he was granted FMLA leave three times. (Schindewolf Dep. 36, 81, ECF No. 53 Ex. 1.) Mr. Schindewolf testified that none of the requested leaves were ever denied. (*Id.* at 36.) Mr. Schindewolf testified that he first took leave in November 2011 to care for his wife, who was experiencing health issues. (Schindewolf Dep. 37-39.) The parties do not agree on how many leaves were taken under FMLA, yet the parties agree that Plaintiff did not exceed the allowable leave time under FMLA.

Dana, pls keep this confidential for now.  I have just started on some significant medication for depression.  I am having some difficulty adjusting to it, which was expected.  I am not in office today because of the adjustment period of a few days and not feeling safe to drive.  Last night coming home was not easy. I should be "adjusted" to this by Monday and back in office.  I can always be reached via email or phone and have advised Dave and Patty of the same. Will keep you posted if anything changes.

(Defs.' Mot. Summ. J. Ex 7.)

### Plaintiff Matthew Schindewolf's May 2013 FMLA Leave

The following Monday, May 6, 2013, Defendant Foster met with Mr. Schindewolf.

(Foster Dep. 85.) Pursuant to a memorandum dated May 6, 2013, from Defendant Foster,

Mr. Schindewolf was placed on administrative leave with pay starting immediately and

instructed to see his physician to obtain answers to the following questions:

a. When you can resume your DPS Director duties at a level of 40 hours per week in the city and,

b. If there are any Americans with Disabilities' Act (ADA) related accommodations that the City (through me as City Manager) as your employer need to make or provide for you in order to perform your duties.

(Schindewolf Dep. 62; Defs.' Mot. Summ. J. Ex. 8; Pls.' Resp. Ex. 16.) The memorandum

also noted that the time off would be considered by the City to be FMLA leave and Mr.

Schindewolf was encouraged "to contact the City of Brighton's Employee Assistance

Program (E.A.P.) for any possible additional assistance" he might need and noted that Ms.

Burke could assist in accessing the E.A.P. on a confidential basis. (Defs.' Mot. Summ. J.

Ex. 8; Pls.' Resp. Ex. 16.)

Mr. Schindewolf's FMLA leave in May 2013, was for his own condition, major

reactive depressive disorder, for which he was treated by his family doctor Dr. Barry

Saltman. (Dep.  Schindewolf at 38-39.) Dr. Saltman removed Plaintiff from work for

approximately six weeks, from May 6, 2013 through June 26, 2013. (Schindewolf Dep. 63; Dr. Saltman Dep. 23.) During the time Mr. Schindewolf was on leave, Defendant Foster did not include Mr. Schindewolf on work emails. (Foster Dep. 118.) Ms. Burke testified that she had not been excluded from work emails when she was on FMLA leave from October to December 2012 for the birth of her child. (Burke Dep. 78-80, Pls.' Resp. Ex. 3.)

While Mr. Schindewolf was on leave, it came to the attention of Defendant Foster that one of two pumps at the wastewater treatment plant had failed, the remaining pump was "about the same vintage" as the failed pump, and the failed pump had not been rebuilt or replaced. Defendant Foster pointed out that Mr. Schindewolf "was responsible for oversight of not only our wastewater plant but two water plants." (Foster Dep. 135-38.) Defendant Foster testified that Mr. Schindewolf had not notified him of the failed pump prior to beginning his leave. (Foster Dep. 155-56.)

### Employment with Onondaga Township

Defendant Foster testified that while Mr. Schindewolf was on leave, he learned of Mr. Schindewolf's position as supervisor of Onondaga Township. (Foster Dep. 102.) While employed by the City, Mr. Schindewolf was elected in November 2012 to a position as the Township Supervisor of Onondaga for a term to last through November 2016. (Schindewolf Dep. 14.) Mr. Schindewolf testified that the job was part-time, approximately two hours per week. (*Id.*) As the Township Supervisor, Mr. Schindewolf used his City email for township business. (*Id.* at 78-79.) The parties dispute whether Mr. Schindewolf notified Defendant Foster of his employment with Onondaga Township. Mr. Schindewolf testified that he "can remember specifically requesting Mr. Foster to check with legal counsel as to whether or not -- . . . to run [for election]. He had indicated, I believe, that he would. And I believe in

5

passing, during passing conversations that we would have whenever we intermittently met, that I had mentioned I was the supervisor." (Schindewolf Dep. 71-72, Pls.' Resp. Ex. 2.) Mr. Schindewolf believes that he had a conversation with Defendant Foster about this at some point in midsummer 2012. (*Id.* at 73.)

Defendant Foster testified that he did not know about Mr. Schindewolf's employment with Odondaga Township until Ms. Burke told him about it, after Mr. Schindewolf had started FMLA and related sick leave with pay in May 2013. (Foster Dep. 102, Defs' Mot. Summ. J. Ex. 2.) Ms. Burke testified that she learned of Mr. Schindewolf's employment with Onondaga Township in May 2013 and she then advised Defendant Foster. (Burke Dep. 42, 45, Defs.' Mot. Summ. J. Ex. 3.) Ms. Burke testified that she had confirmed it by getting the November 2012 election results online from the county website.[2] (Burke Dep. 45.) The City of Brighton Personnel Policies Handbook dated September 1994 and updated 2004 provides the following:

> Employees of the City of Brighton may engage in other employment in off-duty time provided that performance of such outside work would not reduce the employee's ability to adequately perform his/her duties of employment with the City. Employees engaging is (sic) such outside duties of employment, which, in the Employer's opinion, is in conflict with his/her employment with the City, will be subject to disciplinary action, including discharge.

(Defs.' Mot. Summ. J. Ex. 4.)

---

[2] Plaintiff argues that a FOIA request for Odondaga Township meeting minutes was dated August 7, 2013, after July 23, 2013, Mr. Schindewolf's last date of City employment, (Pls.' Resp. Exs. 5, 6.) Ms. Burke testified that she had seen public notices and meeting minutes from their local newspaper of record. (Burke Dep. 46.) Burke also testified that the information requested by the August 7, 2013 FOIA request was received prior to August 7 by their labor attorney. (Burke Dep. 53.)

Mr. Schindewolf agreed that he had sent emails regarding the township board's review of a proposal on June 18, 2013, during the period of time when he was on FMLA leave from the City from May 6, 2013 to June 26, 2013. (Schindewolf Dep. 79-80, Defs.' Mot. Summ. J. Ex. 1.) Mr. Schindewolf also attended several Onondaga Township meetings during this period of FMLA. (*Id.* at 80.) Ms. Burke testified that she had looked online at public notices and meeting minutes from local newspapers and saw that Mr. Schindewolf was performing duties for Onondaga Township while on paid sick leave from the City. (Burke Dep. 46, Defs.' Mot. Summ. J. Ex. 3.) During the time when Mr. Schindewolf was receiving sick leave from the City he also continued his work as a musician in a band. (Schindewolf Dep. 21, 49, Defs.' Mot. Summ. J. Ex. 1.)

**Plaintiff Matthew Schindewolf's Return to Work in June 2013**

Mr. Schindewolf returned to work for the City, with no restrictions, on June 26, 2013. (Am. Compl. ¶ 22; Schindewolf Dep. 67, Defs.' Mot. Summ. J. Ex. 1.) Upon his return, Defendant Foster had a meeting with Mr. Schindewolf. Following the meeting, Defendant Foster drafted a "Summary of Meeting with Matthew Schindewolf, June 26, 2013" that he thought "might be important, given that this was Matt's first day back from FMLA leave pursuant to his doctor's authorization for him to return on that date." (Foster Dep. 112, Pls.' Resp. Ex. 1.) Defendant Foster did not create such memos for two other employees who had returned to work after taking FMLA leave. (*Id.* at 116.) At the meeting, Defendant Foster provided Mr. Schindewolf with an article about depression that he had cut from a newspaper. (Pls.' resp. Ex. 9.) Defendant Foster had decided not to carbon copy Mr. Schindewolf on DPS related communications during his leave explaining that "it could have served as a negative-type of stimulus and or would have been counter-productive as to why

7

you were off on FMLA leave and the purpose of the leave . . . ." (Pls.' Resp. Ex. 9, Summary of Meeting with Matt Schindewolf, 06/26/13.) Defendant Foster notified Mr. Schindewolf that he was not going to give him a new list of tasks on his first day back. (Foster Dep. 121; Pls.' Resp. Ex. 9.) At the meeting, Defendant Foster characterized depression as "serious stuff." (Pls.' Resp. Ex. 9.) Defendant Foster did not have a similar discussion with two other department heads when they came back from FMLA leave. (Foster Dep. 120.)

On Sunday, July 14, 2013, more than a couple of weeks after Mr. Schindewolf had returned from leave, the 3rd street sanitary sewer collapsed in the middle of the city. (Foster Dep. 133-34, Defs.' Mot. Summ. J. Ex. 2; Pls.' Resp. Ex. 4.) Defendant Foster characterized it as possibly the "largest scale sanitary sewer collapse in [his] 23-plus years of doing [his] job as Brighton city (sic) Manager. . . . in terms of the scope and the effects it had on nearby property owners and the complexities of what was required to repair it, the length of time it took." (Foster Dep. 134.) Defendant Foster testified that it did not seem to him as if "Mr. Schindewolf is engaged in the whole situation, not engaged to the extent that I thought he should have been." (Foster Dep. 134.) Defendant Foster believed that he himself was out on the job site substantially more times than Mr. Schindewolf had been. (Foster Dep. 134.)

Mr. Schindewolf attests that "[d]uring the time that Fonson [contractor] and our own staff from the City of Brighton Wastewater Plant were on the site, [he] made regular trips up to the site to observe the work and to be kept informed of the progress." (Schindewolf Aff. ¶ 7, Pls.' Resp. Ex. 7.) He attested to other steps he took following the sewer collapse, including authorizing the Assistant DPS Director to call in a local contractor to perform an

8

emergency excavation and repair, contracting with another company to set up emergency bypass pumping, continuing to monitor a dewatering area, remaining in contact with residents by making trips to the site and walking the area, and other tasks, while also dealing with the failure of an air conditioning unit at the City Hall. (M. Schindewolf Aff. ¶¶ 4-16.) Defendants submitted an invoice showing that the air conditioning repairs that occurred during that time period were performed by an outside company.  (Defs.' Reply Ex. A.)

On July 23, 2013, Defendant Foster had a meeting with Mr. Schindewolf.  Ms. Burke also attended the meeting and the police chief was nearby at Defendant Foster's request, but was not in the room with the others for the meeting. (Foster Dep. 124-25, Pls.' Resp. Ex. 1.) Prior to the meeting, Defendant Foster had "made a determination that Mr. Schindewolf's employment with the City of Brighton needed to be terminated, either via dismissal or resignation." (Foster Dep. 124, Pls.' Resp. Ex. 1.) Defendant Foster "made it clear to Mr. Schindewolf in the meeting that when the meeting was concluded, he was no longer going to be working for the City of Brighton. But [Defendant Foster] also made it clear to him that he had the option to resign immediately, and he chose to resign." (Foster Dep. 125, Schindewolf Dep. 102, 108, Defs.' Mot. Summ. J. Exs. 1, 2.)

Despite Defendant Foster's testimony that he gave Mr. Schindewolf reasons that he would no longer be working for the City, including performing outside employment while on paid sick leave, the handling of the sewer system collapse and the situation regarding the wastewater pump, Mr. Schindewolf in his Response Brief argues that he "disputes that these topics were discussed," and cites his Ex. 7, which is his Affidavit. However, his affidavit at Exhibit 7 does not address what occurred at the July 23, 2013 meeting. (Foster

Dep. 132-36 and Schindewolf Aff., Pls.' Resp. Exs. 1, 7.) Yet in his deposition, Mr. Schindewolf testified that at the meeting, Defendant Foster had mentioned Mr. Schindewolf's work for the Township Supervisor's position and the "passing of a budget, indicating that there were meetings during the time of the FML." (Schindewolf Dep. 102, Defs.' Mot. Summ. J. Ex. 1) During the July 23 meeting, Mr. Schindewolf acknowledged that he was aware that he was an at will employee. Mr. Schindewolf also testified that Defendant Foster mentioned that he had dismissed a previous building inspector and Mr. Schindewolf knew that the purported reason for that person's termination "had something to do" with his working while on sick leave. (Schindewolf Dep. 104-05.) At the end of the meeting, Mr. Schindewolf wrote and signed a letter of resignation. Defendant Foster gave Mr. Schindewolf a letter of recommendation. (Schindewolf Dep. 113, Defs.' Mot. Summ. J. Ex. 1.)

Plaintiffs filed suit on June 19, 2014, against City of Brighton, Brighton City Council and Dana Foster, City Manager. The Brighton City Council was dismissed with prejudice and without costs on February 27, 2015. (Stipulation and Order for Dismissal ECF No. 47.) Plaintiffs in their First Amended Complaint bring the following claims: discrimination/retaliation in violation of the FMLA based on FMLA leave that Plaintiff Matthew Schindewolf took (Count I) (Am. Compl. ¶¶ 30-39); associational discrimination under the ADA (Count II) (Am. Compl. ¶¶ 40-48); discrimination based on perceived disability under the ADA (Count III) (Am. Compl. ¶¶ 49-56); violation of the Michigan Persons With Disabilities Civil Rights Act (PWDCRA) based on a perceived disability of Plaintiff Matthew Schindewolf (Count IV) (Am. Comp. ¶¶ 57-65); and Loss of Consortium, Plaintiff Mary Schindewolf's claim (Count V) (Am. Comp. ¶¶ 66-70).

10

## II.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

11

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party." *Hager v. Pike Cnty. Bd. Of Educ.*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.   Analysis

### A. Whether Plaintiff Matthew Schindewolf's Claims Are Barred By His Resignation

Defendants argue that because Plaintiff Matthew Schindewolf chose to resign, and drafted and tendered a letter of resignation which was accepted by the city manager, Defendant Foster, he was not terminated and therefore, cannot establish the adverse employment action necessary to sustain his claims. Plaintiffs argue that Plaintiff Matthew Schindewolf "only resigned because Defendant Foster offered him an ultimatum, resign or face termination." (Pls.' Resp. 13.)

"When an employee voluntarily resigns, he cannot claim that he suffered an adverse employment decision under the ADA or the FMLA." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 447 (6th Cir. 1999) (discussing constructive versus effective resignation and finding that the plaintiff had effectively resigned and therefore, had voluntarily ended his employment relationship with the defendant). Michigan's PWDCRA also requires a showing "that the defendant took an employment action adverse to the plaintiff." *Aho v. Michigan Dep't of Corr.,* 688 N.W.2d 104, 288 (Mich. Ct. App. 2004).

Defendants argues in the pleadings and at the hearing that Plaintiffs did not plead constructive discharge. Yet Plaintiffs' allegation of an adverse employment action is clear from the amended complaint. Plaintiffs allege that "Plaintiff Matthew Schindewolf was terminated," he was told "that he could choose either to resign or to be terminated," "Plaintiff Matthew Schindewolf was discharged by Defendants on July 23, 2013, in retaliation," "Defendants terminated Plaintiff Matthew Schindewolf," "[a]s a result of his termination . . . ." he has suffered damages, and Plaintiffs called it an "unlawful termination." (Am. Compl. ¶¶ 24, 38, 47, 48, 54, 56, 64, 70.)

Defendants also argue that whether or not a constructive discharge occurred is a matter of state law, citing *Weigold v. ABC Appliance Co.*, 105 Fed. Appx. 702, 708 (6th Cir. 2004). Yet the Court finds a Sixth Circuit case instructive where it considered whether an employee's resignation was voluntary or involuntary in the context of a claim for disability discrimination under Ohio law and a violation of due process rights under section 1983. "In general, employee resignations are presumed to be voluntary." *Rhoads v. Board of Educ. of Mad River Local Sch. Dist.*, 103 Fed. Appx. 888, 895 (6th Cir. 2004). However, "[a]n employee may rebut this presumption by producing evidence indicating that the resignation was involuntarily procured." *Id.*

> Relevant to this inquiry are "(1) whether the employee was given an alternative to resignation, (2) whether the employee understood the nature of the choice [he] was given, (3) whether the employee was given a reasonable time in which to choose, and (4) whether the employee could select the effective date of resignation." The mere fact that an employee is forced to choose between resignation and termination does not alone establish that a subsequent choice to resign is involuntary, provided that the employer had good cause to believe there were grounds for termination. On the other hand, an employee resigns involuntarily if, after being given a choice between resignation and termination,

13

[he] is not granted sufficient time and opportunity to deliberate about the choice.

*Id.* at 895 (citations omitted); *see also Dandridge v. North Am. Fuel Sys. Remanufacturing, LLC*, 2015 WL 1197541, at *5 (W.D. Mich. Mar. 16, 2015) (applying *Rhoads* factors in a similar case, involving claims under FMLA).

The Court also considers Defendants' reliance on *Lagrow v. County of Berrien*, 2008 WL 5197120 (Mich. Ct. App. Dec. 11, 2008), to argue that a "forced choice" does not transform Plaintiff's resignation into an actionable discharge.[3] (Defs.' Mot. Summ. J. 9.)  In *Lagrow*, by the plaintiff's account as the non-moving party, she was told by the county administrator that "he was terminating plaintiff's employment with the county, offered plaintiff the opportunity to resign. Plaintiff, not wanting a termination on her record, accepted the opportunity, and submitted a letter, which she described as a 'letter of resignation.' Accordingly, the end of plaintiff's employment with the county was a result of a resignation, not a termination." *Lagrow v. County of Berrien,* 2008 WL 5197120, at *4 (Mich. Ct. App. Dec. 11, 2008). Plaintiff claimed that her resignation was the product of duress, yet the court noted that Plaintiff's boss ended the 9:00 a.m. meeting to reconvene

---

[3]     Plaintiffs rely on *Laster v. City of Kalamazoo* to argue that "constructive discharge" encompasses situations where the employee is "faced with a choice between resigning or being fired." *Laster v. City of Kalamazoo*, 746 F.3d 714, 728  (6th Cir. 2014) *(*quoting *Burks v. Oklahoma Publ'g Co.*, 81 F.3d 975, 978 (10th Cir. 1996)). "Constructive discharge" under Michigan law "occurs only where an employer or its agent's conduct is so severe that a reasonable person in the employee's place would feel compelled to resign." *Weigold*, 105 Fed. Appx. at 708.  "A claim predicated on a constructive discharge accrues at the time the employee resigns, unless the employee has been given notice of termination, in which case the underlying claim accrues at the time notice was given." *Slone v. Federal Mogul Corp.*, 1999 WL 33435476, at *3 (Mich. Ct. App. Sept. 28, 1999) ("[I]t is clear that one permissible interpretation of events is that plaintiff was terminated when he was put on notice that he must find new employment, and that finding new employment was merely a condition subsequent, the occurrence of which gave effect to the notice.").

at 9:30 a.m., to allow her time to consider her options and gave her access to an office in which she could use the telephone, where she unsuccessfully attempted to contact an attorney. She submitted a letter of resignation and told her boss that she did not want a termination on her record and she wanted the board of commissioners "to know that she had been required to make a choice between the two options." *Id.* at *5. The court found that she "clearly understood that she had the choice of being terminated or resigning." *Id.*

The Court finds those factors the court considered in *Lagrow* not inconsistent with the factors considered in *Rhoads*. In *Lagrow* the allowance of time (less than a half hour) for the plaintiff to make a decision was among the factors leading the court to conclude that the "plaintiff has presented no evidence suggesting that [her boss], upon informing plaintiff that her employment with the county had come to an end, acted unlawfully and deprived her of the exercise of her free will." *Id.* at 5. Plaintiffs attempt to distinguish *Lagrow* because the plaintiff had specifically requested the opportunity to resign as an alternative to termination, and Mr. Schindewolf did not. (Pls.' Resp. 13, ECF No. 59).

Here, the evidence "is not so one-sided that Defendant[s] must prevail as a matter of law." *Dandridge*, 2015 WL 1197541, at *5. The parties do not dispute that it was made clear in the July 23, 2013 meeting that "when the meeting was concluded" Mr. Schindewolf "was no longer going to be working for the City of Brighton" and that he "had the option to resign immediately and he chose to resign." (Foster Dep. 125 and Schindewolf Dep. 102, 108, Defs.' Mot. Summ. J. Exs. 1, 2.) Defendant Foster testified that he concluded the meeting by telling Mr. Schindewolf that if he chose the option to resign, then Defendant Foster would provide him with a letter of reference. (Foster Dep. 167.)

15

Taken in the light most favorable to the non-moving Plaintiff, the evidence may support a finding that Plaintiff was given an alternative to resigning, which was termination, yet also shows that a decision to terminate Plaintiff had already been made at the time Plaintiff was given this option. There is no indication that Plaintiff did not understand the nature of the choice he was given. Unlike *Lagrow*, Mr. Schindewolf had no time, not even a few minutes, outside of the meeting to consider the options of resigning or being terminated. Additionally, he was not given the choice of a resignation date. *Cf. Rhoads,* 103 Fed. Appx. at 895 (the plaintiff had requested resignation in lieu of termination and was given between 10:00 a.m. and 5:00 p.m. to make her decision; "[a]lthough this time frame was perhaps not as lengthy as [the plaintiff] would have liked, she was not pressured to make her decision immediately or otherwise coerced into making an uninformed judgment.").

Defendants' first argument that Plaintiff cannot establish an adverse employment action because he "resigned" does not alone warrant granting judgment in favor of Defendants on the remaining claims where, considering the evidence in the light most favorable to the non-moving party, there is a material question of fact whether Plaintiff's resignation was voluntary.

### B. Plaintiffs' Claims For Discrimination Pursuant To The ADA and Retaliation or Discrimination Pursuant To The FMLA

Defendants argue that Plaintiffs cannot show the elements necessary to establish a prima facie case of discrimination or retaliation under the FMLA, ADA or PWDCRA, and even if they could, Defendants show legitimate reasons for the action and Plaintiffs cannot show that the reasons were pretextual. *See Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th

Cir. 2012) (one of the elements requires a showing that "there was a causal connection between the protected FMLA activity and the adverse employment action"); *Smith v. ACO, Inc.*, 368 F. Supp. 2d 721, 732 (E.D. Mich. 2005) ("The 'causal link' between the protected activity [taking FMLA leave] and adverse employment action is demonstrated by showing that the employer would not have taken the adverse action 'but for' the employee's protected activity." Citations omitted.). Defendants argue that "[t]here is no evidence that would support a finding of a causal connection between any protected activity or characteristic and the ending of [Plaintiff's] employment." (Defs.' Mot. Summ. J. 10-11.) The Court will address the ADA claims first.

### 1. ADA Claims

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

The term 'disability' means, with respect to an individual --

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) *being regarded as* having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1) (emphasis added).

Plaintiff brings a claim that he was discriminated against because he was "regarded as" having an impairment, pursuant to 42 U.S.C. § 12102(3). Section 3 provides that

(A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

"When a plaintiff seeks to establish a case of discrimination under the ADA through indirect evidence, . . . the familiar *McDonell Douglas* burden-shifting framework applies." *E.E.O.C. v. J.A. Thomas & Assocs., Inc.*, 2012 WL 4513630, at *6 (E.D. Mich. Sept. 29, 2012). First, Plaintiff must make a prima facie case of disability discrimination by showing that:

(1) he is disabled, (2) he is otherwise qualified to perform the essential functions of a position, with or without accommodation, and (3) he suffered an adverse employment action because of his disability.[4]

*Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014); *see Blazek v. City of Lakewood, Ohio*, 576 Fed. Appx. 512, 516 (6th Cir. 2014) (applying *Demyanovich* three factor test and *McDonnell Douglas* burden shifting "[i]n the absence of direct evidence of discrimination")).

If Plaintiff establishes a prima facie case, the burden shifts to his employer "to articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual." *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011)(citing *McDonnell*

---

[4] Plaintiffs cite *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011), for a five factor prima facie showing (Pls.' Resp. 15 n.6), but the three-factor showing in *Demyanovich* is a more recent Sixth Circuit case.   Another case in this district has discussed it in detail and its application in cases of both direct and indirect evidence, and most recently, cases involving indirect evidence.  *Whitfield*, 639 F.3d at 259 (citing *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007)); *see generally Ferrari v. Ford Motor Co.*, 2015 WL 1439863 (E.D. Mich. Mar. 27, 2015).

*Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)); *see also Demyanovich, L.L.C.*, 747 F.3d at 434 ("Because [the plaintiff] can prove a prima facie case of disability discrimination, the burden falls to [the defendant] to articulate a legitimate, nondiscriminatory reason for terminating him.").

As Plaintiffs point out, Defendants do not contest whether Plaintiff Matthew Schindewolf was "regarded as" disabled. Plaintiffs provide evidence that Defendant Foster considered Matthew's depression to be "a rather serious situation or concern" and a condition that could possibly affect his decision making and judgment, "as well as just his overall ability to do his duties as DPS Director at that time, which included 24/7 operations like water and sewer utilities." (Foster Dep. 88-89, Pls.' Resp. Ex. 1.)

Plaintiff Matthew Schindewolf held his position with the City for 12 years and the parties do not dispute that he was otherwise qualified for the position he held with the City. As set forth above, Plaintiff has established a genuine fact dispute on the element of whether he suffered an adverse employment decision. Plaintiffs present evidence that Defendants knew or had reason to know of Plaintiff's perceived disability, as evidenced by the testimony of Defendant Foster. (Foster Dep. 88-89.) Finally, Plaintiffs must show evidence to support the element that Plaintiff Matthew Schindewolf suffered the adverse employment action because of the perceived disability. Plaintiffs' response brief provides scant basis for this element in relation to this claim. The amended complaint points to comments made during the July 23, 2013 meeting to support a connection between the adverse employment action and both his perceived disability and his claim for associational discrimination (below). (Am. Compl. ¶ 54.) This is consistent with Plaintiffs' attorney's

19

statements at the hearing wherein she identified comments made during that meeting as a basis for the associational discrimination claim.

Plaintiffs in their response brief argue that the following facts create genuine issues of material fact:

(1) At the July 23, 2013 meeting, "Defendant Foster stated that he thought the City of Brighton was getting in Matthew's way, which Matthew interpreted as relating to his FMLA leave taken to care for his wife." (Pls.' Resp. 23.)

(2) At the July 23, 2013 meeting "Defendant Foster also stated that Matthew would be well suited for consulting work based on his 'impression' that Matthew Schindewolf did not want a 'conventional' job because of Matthew's 'scheduling needs.'" (Pls.' Resp. 23.)

The testimony of both Plaintiff Matthew Schindewolf and Defendant Foster contain no evidence that Plaintiff's perceived disability or his wife was referenced in the July 23 meeting and show that it is only Plaintiff Matthew Schindewolf's "perception" that the comments regarding the City standing in his way referred to his wife.[5] "In order to survive a motion for summary judgment, the non-moving party must be able to show 'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.'" *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) (quoting *Godfrey v. Pulitzer Publ'g Co.*, 276 F.3d 405, 412 (8th Cir. 2002)). Plaintiffs

---

[5] Plaintiff testified that "There was a statement made that the City of Brighton was standing in my way, and it was my perception at the time that it was standing in my way of caring for my wife." (Schindewolf Dep. 111, Pls.' Resp. Ex. 2.)

20

have not shown evidence that would establish this fourth element of the prima facie case.

Plaintiffs have not established that Plaintiff Matthew Schindewolf suffered an adverse employment action *because* of his perceived disability. For these reasons and those set forth on the record at the hearing, the Court finds that Plaintiffs have not established a prima facie claim for discrimination based on perceived disability pursuant to the ADA. The Court dismisses Plaintiff's claim, Count III, based on discrimination pursuant to the ADA.

With respect to Plaintiffs' state law claim under the PWDCRA, "[t]he PWDCRA 'substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim.'" *Donald*, 667 F.3d at 764 (citing *Cotter v. Ajilon Services, Inc.*, 287 F.3d 593, 597 (6th Cir. 2002)(abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012)). Plaintiffs do not argue that the claims should be treated separately, and in fact, address them together. (Pls.' Resp. 14 n.5.) Mich. Comp. Laws § 37.1202 provides that "an employer shall not: "(b) Discharge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability or genetic information that is unrelated to the individual's ability to perform the duties of a particular job or position." Mich. Comp. L. § 37.1202(1)(b). As with Plaintiffs' ADA claims, the Court dismisses Plaintiffs' Count IV, the PWDCRA claim. *See Donald*, 667 F.3d at 764 (the court considered the ADA and PWDCRA claims together and finding that they could not survive the motion for summary judgment, the "district court correctly dismissed them.").

In count II, Plaintiffs allege associational discrimination under the ADA. In addition to Defendants' motion for summary judgment on this issue, Plaintiffs moved for partial

21

summary judgment on an element of this issue. (Defs.' Mot. Summ. J. 11, 14, ECF No. 53; Pls.' Mot. Partial Summ. J. 52.) The ADA precludes discrimination "because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). As Plaintiffs point out, in order to establish a *prima face* case for associational discrimination, the employee must establish that:

> (1) [H]e or she was qualified for the position; (2) he or she was subject to an adverse employment action; (3) he or she was known to have a relative with a disability; and (4) the adverse employment action occurred under  a circumstance that raises a reasonable inference that the disability of the relative was a determining factor in the decision.

*Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 487 (6th Cir. 2011) (Noting that the claim for associational discrimination "arises under an infrequently litigated section of the Act, which this Court has never addressed in a published opinion." *Id.* at 486.). Plaintiffs do "not offer any direct evidence of discrimination, and [their] claim must therefore be analyzed through a *McDonnell Douglas*-like burden-shifting test," as discussed above. *Stansberry*, 651 F.3d at 487.

As set forth above, with respect to the "regarded as" disability discrimination claim under the ADA, there is neither argument nor evidence that Plaintiff was not qualified for his position and Plaintiffs have shown a genuine dispute of material fact as to the existence of an adverse employment action. In a separate opinion and order, this Court denied Plaintiffs' motion for partial summary judgement on the ADA claim for associational discrimination, finding that there exists a genuine dispute of material fact as to whether Defendants had knowledge of Plaintiff Mary Schindewolf's disability. In considering the evidence in the light most favorable to Defendants, the non-moving parties, the Court found

that Plaintiffs failed to show that there is no genuine issue as to the third prong of the associational discrimination framework, that Plaintiff Matthew Schindewolf was known to have a relative with a disability, and the Court denied Plaintiffs' motion for partial summary judgment on that issue. Likewise, herein the Court finds that evidence set forth by Plaintiff establishes a genuine issue of fact with respect to this element.

The fourth and final element is at issue here, that the "adverse employment action occurred under a circumstance that raises a reasonable inference that the disability of the relative was a determining factor in the decision." *Stansberry*, 651 F.3d at 487. Several circuits, including the Sixth Circuit have relied on an "outline of three theories into which 'associational discrimination' plaintiffs generally fall:" (1) the expense theory, "where an employee suffers an adverse employment action because of his or her association with a disabled individual covered under the employer's health plan, which is costly to the employer," (2) the disability by association theory, which is not at issue here, and (3) the distraction theory, which "is based on the employee's being somewhat inattentive at work because of the disability of someone with whom he or she is associated." *Stansberry*, 651 F.3d at 487. The *Stansberry* court acknowledged that these three theories are "not necessarily an exhaustive list." *Id.*

Plaintiffs initially relied on the expense theory in their complaint, alleging that Defendants terminated Plaintiff "due to the expense of Plaintiff Mary Schindewolf's medical expenses." (Am. Compl. ¶ 47.) In their response brief, Plaintiffs identified no evidence in support of this theory. In their own motion for partial summary judgment, Plaintiffs did not address the fourth factor and when questioned directly at the hearing about the basis for

23

raising the economic theory, Plaintiffs' attorney was unable to cite any evidence in support of this allegation and instead noted that the list of theories was not an exhaustive list and mentioned instead the distraction theory. The Court finds that Plaintiffs abandoned the economic theory, and even if it were substantively considered, Plaintiff's have provided no evidence to contradict Defendants' evidence that the City is part of a health insurance risk pool and high usage by an employee would not result in higher premiums for the City, and that the City does not see information related to benefit utilization by an employee.[6] (Burke Dep. 89, Defs.' Mot. Summ. J. Ex. 3.)

Similarly, Plaintiffs failed to identify specific evidence in their response that would support the distraction theory of discrimination and upon questioning at the hearing, Plaintiffs' attorney referred only generally to evidence of pretext included in Plaintiffs' brief. Plaintiffs' attorney then referred to statements they say were made at Defendant Matthew Schindewolf's termination meeting of July 23, 2013. The Court has discussed those statements above, with respect to the ADA claim for discrimination based on perceived disability, and finds that Plaintiff has not presented evidence to raise a reasonable inference that disability was a determining factor in the adverse employment action.

---

[6]Ms. Burke testified that the City pays up to a "hard cap" amount for each employee and agreed that an employee's usage of the health care system would have nothing to do with that cap. (Burke Dep. 89.) Ms. Burke also testified that she wanted "to make it clear that the city does not see anything pertaining to utilization, what is used for what employee, whether it's doctor's visits, scripts or anything. That information is kept strictly with Grace & Porta Benefits." (Burke Dep. 101.) Defendant Foster testified to the following: "[M]y understanding is the City of Brighton's employees alone and its dependents alone are not -- usage are not what determines the cost. Because as I recall, we're part of a larger regional group, and the experience of the larger group is what's evaluated. . . . [W]e're not the only employer in the group, from what I recall." (Foster Dep. 185, Defs.' Mot. Summ. J. Ex. 2.)

24

For these reasons and those set forth on the record at the hearing, the Court finds that Plaintiffs have not established a prima facie claim for associational discrimination pursuant to the ADA. The Court dismisses Count II, Plaintiff's claim based on associational discrimination pursuant to the ADA.

### 2.    Plaintiffs' Count I: Discrimination/Retaliation in Violation of FMLA

The FMLA provides a private right of action to employees to protect their rights to such leave under two different theories:  (1) the interference or entitlement theory, and (2) the retaliation or discrimination theory. *See Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004). To make out a prima facie case of FMLA retaliation, an FMLA plaintiff must establish that:

> (1) [he] was engaged in an activity protected by the FMLA; (2) the employer knew that [he] was exercising [his] rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to [him]; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Donald*, 667 F.3d at 761. Unlike analysis of FMLA claims under the interference theory, "[u]nder the retaliation theory (also known as the discrimination theory), . . . the employer's motive *is* an integral part of the analysis." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). This is "because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Id.*

> Alternatively, a plaintiff may establish a prima facie case by demonstrating that "1) he is a member of a protected class; 2) was qualified for the job; 3) he suffered an adverse employment decision; and 4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees."

25

*Clark v. Walgreen Co.*, 424 Fed. Appx. 467, 473 (6th Cir. 2011) (quoting *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir.2001)).

There is no dispute that Plaintiff Matthew Schindewolf's absence from May 6 to June 26, 2013, was an exercise of FMLA leave. (Foster Memo to Schindewolf May 6, 2013, Defs.' Mot. Summ. J. Ex. 8, Pls.' Resp. Ex. 16.) There is also no dispute that Matthew Schindewolf had taken intermittent FMLA leave in the past to provide care for his wife, despite some question as to whether the April and May 2013 leave for his wife's appointments was FMLA leave. There is enough evidence to establish the first element of a prima facie case for FMLA discrimination. Similarly, there is no dispute that the employer knew that Plaintiff's leave was FMLA leave, a right under the FMLA. As set forth above, Plaintiffs have produced evidence to raise a question of material fact as to the third element, whether Plaintiff Matthew Schindewolf suffered an adverse employment action when his employment ended on July 23, 2013.

Plaintiff must show evidence in support of the final element, that there was a causal connection between the FMLA activity and the adverse employment action. Defendants argue that Plaintiff cannot meet this burden. To show that there is no evidence that the City discriminated or retaliated against Plaintiff because of this FMLA leave, his wife's condition or any perceived disability, Defendants first rely on Mr. Schindewolf's deposition, where, Defendants allege, Mr. Schindewolf "conceded that he had no evidence aside from his personal belief that his FMLA leave was a factor in any employment decision" when he testified as follows:

Q: Well, I want to know outside of this Exhibit Number 1, your Complaint, what facts or evidence that you possess that support your claim that you were

discriminated against, retaliated against because of anything associated with any FMLA leave you took?

A: I believe that's clear in the Complaint.

Q: So that's all you're relying on? You don't have any facts or evidence outside of your Complaint? This is your personal believe that that was the basis for his decision; is that correct?

A: Yes.

(Schindewolf Dep. 108-09, Defs.' Mot. Summ. J. Ex. 1.) "[S]peculation or conjecture" is insufficient to preclude summary judgment. *See Lewis*, 355 F.3d at 533.

Defendants also argue that the fact that the July 23, 2013 meeting at which Plaintiff's employment ended occurred subsequent to his FMLA leave from May 6, 2013 to June 26, 2013, is not enough to establish a causal connection. "[T]he law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." *Donald*, 667 F.3d at 763 (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001) ("[T]emporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual.")); *see also Smith*, 368 F. Supp. 2d at 734 ("Temporal proximity, standing alone, is not sufficient to establish a causal link . . . .").

Plaintiff testified that he first took FMLA leave to care for his wife in November 2011, and again in 2012 for his wife and, finally, arguably, again in April and May 2013, to care

for his wife.[7] (Schindewolf Dep. 37-39.) The event closest in time to the end of Mr. Schindewolf's employment is Mr. Schindewolf's own FMLA leave in May to June 2013.

To establish causal connection, Plaintiffs show that Ms. Burke sent a copy of the "at will" policy to Defendant Foster as an attachment to an April 17, 2013 email regarding Matthew's request for leave to take care of his wife in April and May 2013, only three months prior to Mr. Schindewolf's separation from the City. (Pls.' Resp. 22-23, Ex. 10.) In the same email, Ms. Burke also inquired whether Defendant Foster wanted a copy of Mr. Schindewolf's employment agreement, and the next day, Ms. Burke emailed Ms. Meier, from payroll, to inquire, "Is there any way you can tell me how much time Matt missed during the months of Oct/Nov/Dec of last year?" (Pls.' Resp. Ex. 11.)

Although Defendant Foster testified that he recalled asking for the policy and did not recall the specific reason he asked for it (Foster Dep. 73-74), Ms. Burke testified to the following:

Q:    Okay.  And why did you send that to Mr. Foster on April 17th, 2013?

A:    From what I recall that day, Dana made an impromptu visit over at the Department of Public Services building.  And he walked into the DPS garage to find Mr. Schindewolf smoking a cigarette while sitting in a lounge chair with a cutoff tank top shirt and camouflage pants reading personal mail, which I will refer to Exhibit 16 --

---

[7]Plaintiffs point out that there is some dispute as to whether the leave that Mr. Schindewolf took to attend his wife's appointments on April 24, May 1, and May 2, 2013, was classified as FMLA leave. (Pls.' Resp. 22, Ex. 10; Burke Dep. 25-30.)  Plaintiffs argue that there are 'genuine issues of material fact as to whether [Mr. Schindewolf's] FMLA leave taken to care for his wife was the 'but for' cause of his termination." (Pls.' Resp. 22-23) (citing *Smith*, 368 F. Supp. 2d at 721). For purposes of this motion, the Court consider's this leave in the light most favorable to the non-moving party, Plaintiffs, and will consider it as FMLA leave for the discreet purpose of this motion. Again, there is no allegation that Plaintiff was denied FMLA leave.

Q:     Well, I'm going to stop there.  I'm going to ask you some questions --
okay? -- because I've got my exhibits.

A:     -- which is against city policy, no smoking policy and our attire policy.

Q:     Okay.  So who requested -- did Dana request that you send him the at-
will policy?

A:     Yes.

Q:     Did he request the employment agreement, as well?

A:     I don't know if he requested it.  I think I offered it up, as indicated in my
e-mail.

Q:     So you said that Dana Foster requested the at-will policy; correct?

A:     Yes.

Q:     How did he request this of you? E-mail? Phone?

A:     I don't know if it was verbal or e-mail.

(Burke Dep. 34, Pls.' Resp. Ex. 3.) The court finds that this raises a genuine issue of
material fact as to the purpose of Defendant Foster's request. Plaintiffs also showed
evidence that while Plaintiff was on his own FMLA leave, he was excluded from email
correspondence and Ms. Burke had not been excluded from email correspondence when
she was on leave. (Foster Dep. 118, Burke Dep. 78-80.) Defendant Foster also prepared
a Summary of Meeting following a meeting he had with Plaintiff after Plaintiff returned from
FMLA leave, and he had not done so with others who returned from leave, including
discussing a news article about the health condition for which Plaintiff had taken leave.
(Foster Dep. 116, 120.)

Again, Plaintiffs argue that evidence of a causal connection comes from Defendant
Foster's statements at the July 23 meeting, including the statement that the City of Brighton

29

was standing in his way. (Schindewolf Dep. 111.) Plaintiffs argue that Defendant Foster told Mr. Schindewolf in the meeting that "maybe a consulting kind of activity or business might be better for him than a conventional job with a conventional schedule, . . . But I was trying to draw a distinction between consulting and more independent work than the nature of his position that he had been in with the City of Brighton." (Pls.' Resp. 21; Foster Dep. 168.) Mr. Foster testified that he "said this in general terms -- that given what I understood to be his interests and his scheduling needs, that consulting could be a better overall situation for him. And he had done consulting prior to working for the City of Brighton.  So I was trying to encourage him to think of that as another opportunity." (*Id.*)  As set forth above, the comments are not objectively related to Plaintiffs' conditions or the use of FMLA leave and speculation about the scheduling comment is more likely to lead to a conclusion that it references Mr. Schindewolf's outside employment obligations and interests (such as the township job) than FMLA or disability-related concerns.

The Court finds that the provision of the at-will provisions in connection with an email about Plaintiff's request for FMLA leave, combined with the lack of evidence from Defendant Foster about the reason for the request, as well as the temporal connection between the final FMLA leave and the adverse employment action, raises a question of fact as to a causal link between Plaintiff's requested FMLA leave and the adverse employment action.

Because Plaintiffs have shown evidence to support a prima facie case of FMLA retaliation/discrimination, the Court next applies the familiar *McDonnell Douglas* burden-shifting test. *Edgar*, 443 F.3d at 508 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S.

30

792 (1973)). If the FMLA plaintiff establishes a prima facie case, the burden shifts to his employer who must then proffer a legitimate, non-discriminatory reason for its adverse employment action. *Edgar*, 443 F.3d at 508. If the employer carries this burden, then the plaintiff must show that the employer's reason for his termination was a pretext for retaliating against the plaintiff for taking his FMLA leave. *Bell v. Prefix, Inc.*, 321 Fed. Appx. 423, 426 (6th Cir. 2009); *Joostberns v. United Parcel Servs, Inc.*, 166 Fed. Appx. 783, 790 (6th Cir. 2006).

The Sixth Circuit has held that "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.' " *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012) (quoting *Chen v. Dow Chemical Co.*, 580 F.3d 394, 401 (6th Cir. 2009)). The "key inquiry ... is 'whether the employer made a reasonably informed and considered decision before taking' the complained-of action." *Id.* (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598–99 (6th Cir. 2007)). "The employer certainly must point to particularized facts upon which it reasonably relied. But 'we do not require that the decisional process used by the employer be optimal or that it left no stone unturned.'" *Id.* (citations omitted).

Defendants cite multiple legitimate business reasons for their actions. Defendant Foster testified that prior to the July 23rd meeting at city hall with Defendant Matthew Schindewolf, he had "made a determination that Mr. Schindewolf's employment with the City of Brighton needed to be terminated, either via dismissal or resignation." (Dep. D.

31

Foster at 123-24, Pls.' Resp. Ex. 1). Defendant Foster testified that he based his decision that Mr. Schindewolf would no longer be employed by the City on several things:

> First of all, not long before the July 23rd meeting -- I can't recall the exact date -- but I had learned about and read minutes of Onondaga Township board meetings at which Mr. Schindewolf was in attendance while on sick leave with pay from the City of Brighton, particularly in June of 2013, which included amongst other things, four or five -- I can't recall the exact number -- of budget meetings. I mean, they're actually labeled as budget meetings by the township board. That was primary reason number one, . . . . Because in my view, he was doing at least some of his similar duties as he required to work for the City of Brighton in his DPS Director position at the same time while on a a leave, sick leave with pay, and pursuant to a doctor's order or letter that said he wasn't supposed to resume any of those duties until June 26th.

(Foster Dep. 132-33.) Defendant Foster testified that the other reasons included the situation with a very serious sanitary sewer collapse and Defendant Foster's belief that "it just didn't seem . . . that Mr. Schindewolf was engaged in the whole situation" to the extent Defendant Foster thought he should have been and a situation in which one of two pumps at the wastewater treatment plant had failed, the remaining pump was "about the same vintage" as the failed pump, and the failed pump had not been rebuilt or replaced, pointing out that Mr. Schindewolf "was responsible for oversight of not only our wastewater plant but two water plants." (Foster Dep. 133-38.) Evidence shows that Plaintiff Schindewolf also used his City email for township business. Defendant Foster testified that although he did not "think he touched on this" in the July 23 meeting, prior to July 23 he had evidence from Ms. Burke, the HR Director, of Plaintiff Matthew Schindewolf having used his City email account for Onondaga Township business.[8] (Foster Dep. 141.)

---

[8] For those aspects of Plaintiff's outside employment for which there is not evidence that Defendants' had knowledge prior to the July 23 meeting, (for example, Plaintiff's work with the band during his FMLA leave and the actual extent to which he performed work for

At the July 23 meeting, Defendant Foster told Mr. Schindewolf that working for another entity doing similar work or duties while on sick leave with pay from the City was the reason another prior employee had been dismissed, and unlike the other employee who did not have an option to resign, Defendant Foster told Mr. Schindewolf that he was providing an option to resign if Mr. Schindewolf wanted to resign that day. (Foster Dep. 167.) Defendant Foster testified that he told Mr. Schindewolf that the combination of factors caused him "to lose confidence" in Plaintiff. (Foster Dep. 135.)

Plaintiff's argument that the Personnel Policies did not prohibit outside employment, and have since been amended to require written permission for the same, ignore the distinguishing issue, which is that Plaintiff was working while on paid leave and representing to the City that he was unable to work, despite his doctor having written a note dated May 7, 2015, indicating that Plaintiff was finding it difficult to perform his job and making it clear in the letter that Plaintiff could return to work in six weeks. (Dr. Saltman Dep. 22-23, 25-26, Defs.' Mot. Summ. J. Ex. 9; *see also* Schindewolf Dep. 63 (agreeing that the doctor's recommendation was that he was too ill to come to work).) As Defendants argue, the "misuse of sick leave payments constitutes an additional legitimate business reason for any adverse action."

Defendants have shown legitimate business reasons for the adverse employment action. There is no disagreement that Plaintiff Matthew Schindewolf was made aware of

---

Onondaga Township while he was on-the-clock at the City) the Court does not consider those as evidence of a legitimate, non-discriminatory reason for the adverse employment action. *See generally McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 360 (1995) (Where misconduct was not discovered until after the plaintiff was fired, "[t]he employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was fired for the nondiscriminatory reason.").

these reasons in the July 23 meeting, as evidenced by the following from his testimony: "I was told that I would be terminated or I could resign"; "He had mentioned work for the Township Supervisor's position. Let's see. What else? The passing of a budget indicating that there were meetings during the time of the FML"; "He [Defendant Foster] did mention that he had dismissed a building inspector. That would have been back maybe at the beginning of my term there"; "There was reference in that meeting of my employment with Onondaga, yes;" "And then he talked about things being out on the Internet, which is correct. He did talk about the budget meetings, which is correct"; and "He indicated he had lost confidence in me." (Schindewolf Dep. 102-06, Defs.' Mot. Summ. J. Ex. 1.) The Court finds that Defendants have presented a legitimate non-discriminatory reason for Defendants to terminate him.

Under the McDonnell Douglas burden shifting framework, after Defendants have presented a legitimate, non-discriminatory reason for their decision to terminate Plaintiff, Plaintiffs' "claims could survive summary judgment only if [Plaintiffs] can show that [Defendants'] stated reasons are a pretext for unlawful discrimination." *Donald*, 667 F.3d at 761-62. "[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993). The  Sixth Circuit, in a discrimination case under the Rehabilitation Act, has held that to satisfy the pretext burden, a plaintiff must show "either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." *Jones v. Potter*, 488 F.3d 397, 406 (6th Cir. 2007) (quoting *Manzer*

*v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994) (emphasis omitted));

*Blazek*, 576 Fed. Appx. at 516. The "court has typically grouped the first and third tests

together because they are both 'direct attacks on the credibility of the employer's proffered

motivation for firing [the employee] and, if shown, provide an evidentiary basis for what the

Supreme Court has termed 'a suspicion of mendacity.'" *Jones*, 488 F.3d at 406 (citing

*Manzer*, 29 F.3d at 1084.).

Plaintiffs put forth evidence showing that the reasons were pretextual including the

reference to the timeline in which the FOIA requests were sent to obtain meeting minutes,

discussed briefly *supra* at p.6 fn.2, and the provision of the at-will policy in connection with

the April 17, 2013 FMLA email. For the reasons stated herein and on the record, Plaintiffs'

have shown evidence sufficient to raise a question of fact as to whether the reasons for the

adverse employment action were pretextual. The Court denies Defendants motion as to

Plaintiffs' FMLA claim, Count 1.

### C.    Whether Plaintiffs' Official Capacity Claims Are Duplicative

Defendants seek to dismiss the claims alleged against Defendant Foster in his

official capacity as city manager as duplicative of the claims against the City. The Court

agrees.

"Official capacity suits 'generally represent only another way of pleading an action

against an entity of which an officer is an agent.'" *Moore v. Tanner*, No. 07-10442, 2008 WL

3876346, at *6 (E.D. Mich. Aug. 18, 2008) (In *Moore*, the individual capacity claims could

not be maintained under the ADA, yet the official capacity claims survived where the court

had already dismissed the jail because it was clear that the plaintiff meant to proceed

against one of the jail employees and not the jail. "An ADA and RA [Rehabilitation Act of 1973]  suit may be brought against a public entity by naming the entity itself or by suing an agent of the entity in his official capacity." *Id.* at *6.) (citing *Monell v. New York City Dept. of Soc. Services*, 436 U.S. 658, 690 n. 55 (1978)). Therefore, claims against defendants in their official capacities are duplicative of the claims against the public entity itself. *Ebelt v. County of Ogemaw*, 231 F. Supp. 2d. 563, 568 (E.D. Mich. 2002).

Courts routinely dispose of such redundant claims, raised under the ADA or otherwise.  *See Hamilton v. Carson-Newman Coll.*, No. 09-479, 2010 WL 3806503, at *5 (E.D. Tenn. Sept. 23, 2010) (". . . [A] claim against an individual in her official capacity is tantamount to a claim against the employer and where, as here, the employer is also sued, the official capacity suit against the employee is simply redundant and may be dismissed."); *see also Ebelt*, 231 F. Supp. 2d at 568. In this case, the claims against Defendant Foster were brought against him in his official capacity. He is named in the first amended complaint as the Brighton City Manager "in his official capacity." (Am. Compl. ¶¶ 2, 43, 61.) There are no claims against Defendant Foster in his individual capacity and in fact, the claims brought against him are those brought against the City. The Court dismisses the claims brought against Defendant Foster.

### D.    Whether Plaintiff Mary Schindewolf's Loss of Consortium Claim Is Unsustainable And Barred By Governmental Immunity

Defendants argue that Plaintiff Mary Schindewolf's claim for loss of consortium must be dismissed because the claim is inapplicable to the federal claims, applies only in association with the PWDCRA claim, and is barred by governmental immunity. Plaintiffs rely on *Milnikel v. Mercy-Mem'l Med. Ctr., Inc.*, 454 N.W.2d 132, 134 (Mich. Ct. App. 1989)

36

to argue that Mrs. Schindewolf's loss of consortium claim is not barred by governmental immunity under Mich. Comp. Law 691.1407. Rather than bolster this position, *Milnikel* holds only "that a claim for loss of consortium is not precluded by the [Michigan Handicapper's Civil Rights Act]." *Id.* The issue at hand is not whether the PWDCRA precludes Mrs. Schindewolf's claim, but instead whether Mich. Comp. Law 691.1407 bars recovery as the facts stand in this case.

Loss of consortium is an independent yet derivative cause of action. *Wesche v. Mecosta County Road Comm'n*, 746 N.W.2d 847, 854 (Mich. Ct. App. 2008). Here, Mrs. Schindewolf's derivative loss of consortium claim cannot survive if Mr. Schindewolf's PWDCRA claim is subject to governmental immunity. *Id.* (discussing limits of immunity from liability under Mich. Comp. Law 691.1407 regarding loss of consortium). Nor can it survive to the extent that the PWDCRA claim is dismissed.  Mich. Comp. Law 691.1407(2) states in relevant part:

> Except as otherwise provided in this section . . . each officer and employee of a governmental agency . . . and each member of a board, council, commission or statutorily created task force of a governmental agency . . . is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service . . . if all of the following are met:
>
> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage."

Plaintiffs do not dispute that Defendant Foster and/or the City were operating within the scope of their authority and in the exercise of a governmental function, nor do Plaintiffs maintain that Defendants' conduct was grossly negligent. Plaintiffs further fail to identify any statutory exception to government immunity that applies in this instance. *See Wesche*, 746 N.W.2d at 853 n.10 (listing the six statutory exceptions). Indeed, Plaintiffs provide no reason, besides misplaced reliance on *Milnikel*, why governmental immunity would not apply to Defendants in this case. Nor does this claim survive in the absence of the PWDCRA claim.  Plaintiff Mary Schindewolf's claim for loss of consortium is dismissed.

## IV.   CONCLUSION

For the reasons set forth above, the Court:

A.   DENIES Defendants' motion in part, finding that there is enough evidence from which a fact finder could determine that Plaintiff Matthew Schindewolf's resignation was involuntary;

B.   DENIES Defendants' motion as to Plaintiffs' Count I, FMLA discrimination;

C.   GRANTS Defendants' motion as to Plaintiffs' Counts II and III, pursuant to the ADA Claims and DISMISSES Plaintiffs' Counts II and III;

D.   GRANTS Defendants' motion as to Plaintiffs' Count IV, pursuant to the PWDCRA and DISMISSES Plaintiffs' Count IV;

E.   GRANTS Defendants' motion as to the claims against Defendant Foster in his official capacity and DISMISSES the claims against Defendant Foster and DISMISSES Defendant Foster as a Defendant in this case; and

F.   GRANTS Defendants' motion as to Count V, Plaintiff Mary Schindewolf's loss of consortium claim, and DISMISSES Count V.

s/Nancy G. Edmunds_____
Nancy G. Edmunds
United States District Judge

Dated:  May 29, 2015

38

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 29, 2015, by electronic and/or ordinary mail.

s/Johnetta M. Curry-Williams
Case Manager